UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL ACTION NO. 01-10373-RWZ


UNITED STATES OF AMERICA

v.

PAUL A. DECOLOGERO, *et al.*

<u>MEMORANDUM OF DECISION</u>

July 11, 2013


ZOBEL, D.J.

Paul A. DeCologero ("Paul A."), Paul J. DeCologero ("Paul J."), John P. DeCologero, Jr. ("John Jr."), and Derek Capozzi ("Capozzi") have moved under 28 U.S.C. § 2255 to vacate their sentences. Their motions are based on two FBI reports they claim are exculpatory material that the prosecution should have produced before trial. Capozzi has also filed a variety of other motions.

## I.    Background

In the 1990s, Paul A. ran a Boston-based criminal organization known as the "DeCologero crew." Its members included his brother John P. DeCologero and his nephews Paul J. and John Jr., along with Capozzi and others. The crew traded in drugs and guns, and used force to compete with rival criminal factions. In 1996, members of the crew acting on orders from Paul A. murdered a nineteen-year-old woman named Aislin Silva ("Silva"), because Paul A. was afraid she would betray the crew to the

police.

In October 2001, the four defendants currently seeking relief were charged with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and a number of related crimes.[1] The latter included violations of the federal drug and gun laws, violations of the Hobbs Act by robbery from and extortion of rival drug dealers, and witness tampering by Silva's murder.

**A. The Trials**

Paul A., Paul J., and John Jr. were tried together in early 2006. All three were convicted on several counts, including the RICO and Hobbs Act counts mentioned above. In addition, Paul A. and Paul J. were convicted for their role in Silva's death. The testimony at trial regarding Silva's death came primarily from Stephen DiCenso, a former member of the DeCologero crew who was closely involved in the killing.

According to DiCenso, Silva's murder occurred as follows: In November 1996, the police found a stash of guns that the DeCologero crew had hidden in Silva's apartment. After that discovery, Paul A. decided to kill Silva because he believed she would implicate the entire crew if she were interrogated about the guns. He first planned to trick Silva into overdosing on drugs. He told Paul J. to acquire some high-grade heroin, which Paul J. did. DiCenso and another crew member, Kevin Meuse, then gave Silva the heroin and told her it was really good cocaine. She took some of the heroin but did not overdose.

---

[1] The indictment also named John P. DeCologero, Joseph F. Pavone, and Daniel J. Tsoukalas as defendants. None of those individuals are parties to the motions considered here.

When the overdose plan failed, Paul A. decided that Meuse should kill Silva by force. On November 13, 1996, Meuse went to DiCenso's father's apartment, where DiCenso had brought Silva. He sent DiCenso out to buy a hacksaw and cutting shears. While DiCenso was gone, Meuse killed Silva by breaking her neck. DiCenso returned with the tools to find Silva dead. Meuse then left to get Capozzi so he could help dispose of the body. The three men used the tools to dismember Silva's body in DiCenso's bathtub. They stuffed her body parts into plastic garbage bags and then into gym bags, put the bags in Capozzi's car, and drove to a Home Depot to buy lime and a shovel. Using the shovel and lime, they buried Silva's remains in some woods on the North Shore. They left the bloody trash and gym bags in a dumpster near a car wash in Danvers.

DiCenso's testimony was corroborated by physical evidence, including the bloody trash bags and gym bags found in the dumpster in Danvers. DNA from the blood, hair, and tissue on the bags belonged to Silva. Four empty lime bags were also found in the dumpster. The Home Depot's security video showed Capozzi and Meuse leaving with four bags of lime and a shovel; a receipt from the Home Depot showed a purchase of four bags of lime, a shovel, gloves, flashlights, and doorknobs. Matching packaging for the flashlights and gloves was found in the Danvers dumpster, and matching doorknobs were found in Meuse's apartment.  In addition, a box for a police scanner found in the dumpster showed Meuse's fingerprint, and a police scanner of the same model was found in Meuse's car.

DiCenso's testimony was also corroborated by other witnesses. A drug dealer

named Antonio Centeno testified to selling thirty bags of high-grade heroin to Paul J., and testified that Paul J. asked for heroin strong enough to make someone overdose. John P. DeCologero ("John Sr.")—brother of Paul A., father of Paul J. and John Jr., and former member of the DeCologero crew— testified he heard Paul A. tell Paul A.'s son that the heroin intended for the overdose didn't work. John Sr. also heard from John Jr. the details of how Meuse had killed Silva, and how DiCenso and Capozzi had helped him dispose of her body. Finally, another member of the DeCologero crew named Thomas Regan testified that Paul A. told him that Meuse and DiCenso had killed Silva and cut up her body.

Further testimony from DiCenso and others explained how Silva became involved with the DeCologero crew, how the crew acquired the guns they stored at Silva's apartment, and how the crew kept Silva away from the police after the guns were discovered. There was also substantial evidence describing many of the DeCologero crew's other criminal acts under Paul A.'s leadership. That evidence need not be recounted in detail here, but it was extensive and thoroughly corroborated.

Paul A. attempted to call as a witness the leader of another criminal faction, Gigi Portalla, to show that Portalla was involved in Silva's murder. That theory corresponded with early press reports about the Silva murder that indicated police were investigating Portalla and his crew. However, Portalla was in federal custody at the time of Paul A.'s trial, and could not be transferred in time to testify because Paul A. did not request his presence until the trial had already run for twenty-nine days. In any case, as the First Circuit confirmed on appeal, Portalla's proffered testimony was "tangential and

4

potentially cumulative." <u>United States v. DeCologero</u>, 530 F.3d 36, 75 (1st Cir. 2008).

Paul A. was convicted of witness tampering conspiracy, witness tampering by misleading conduct, witness tampering by attempting to kill, and witness tampering by killing, among other crimes. Several predicate acts underlying his substantive RICO conviction also stemmed from his role in Silva's death. Paul J. was convicted of witness tampering conspiracy, witness tampering by misleading conduct, and witness tampering by attempting to kill, among other crimes; the latter two crimes were also predicate acts for his RICO conviction. John Jr. was not charged with any offenses relating to the Silva killing.

Capozzi was tried separately in two trials. At the first, in late 2004, he was convicted of Hobbs Act conspiracy for conspiring with the DeCologero crew to rob other drug dealers.[2] At the second, in 2005, he faced charges related to his role in the Silva killing. The government again presented DiCenso, who testified along the lines discussed above. In addition, Capozzi's friend Jason Stone testified that Capozzi had twice confessed to him his role in Silva's killing. Capozzi did not contest the government's evidence that he, Meuse, and DiCenso dismembered and buried Silva. Instead, he staked his hopes on a technicality. He argued that (contrary to DiCenso's testimony) DiCenso, not Meuse, actually broke Silva's neck.[3] Therefore, he argued, he was innocent of the charged offense, because the indictment charged him as accessory

---

[2] He was also acquitted on one count of being a felon in possession of firearms. The jury did not reach a verdict on the three remaining counts (for Hobbs Act robbery, possession of marijuana with intent to distribute, and use of a firearm in relation to drug trafficking and a crime of violence).

[3] Meuse committed suicide in March 1997, a few months after Silva's murder and long before these trials.

to Meuse's killing of Silva when it should have charged him as accessory to DiCenso's killing of Silva. He also argued that he had no advance knowledge of any conspiracy to kill Silva; this argument was unavailing because, as a matter of law, the conspiracy to kill Silva continued so long as the conspirators were acting together to destroy incriminating evidence. See United States v. Medina, 761 F.2d 12, 18 (1st Cir. 1985). In any case, the testimony at trial indicated that Capozzi could have known of the conspiracy to kill Silva in advance. Capozzi was convicted of witness tampering conspiracy and accessory after the fact to witness tampering by killing.

All four defendants unsuccessfully appealed their convictions and sentences.

**B. The New Evidence**

In 2010, Paul A., Paul J., and John Jr. became aware of two FBI reports that, they claim, the prosecution should have disclosed before trial.[4] The first is a three-page report, stamped with Bates numbers 000438-440, describing a September 10, 1999, interview of a woman named Michelle Noe. The interview took place shortly after Noe's arrest on an outstanding warrant for an unarmed bank robbery. It was apparently conducted by Lt. Eugene A. Kee Jr., of the Massachusetts State Police, along with Detectives Thomas J. Romeo and Michael P. Murphy of the North Reading Police.

Noe reported that in mid-November of 1996, her boyfriend, Charles McConnell, had come home one night in a panic with his clothes and his arms covered in blood. McConnell apparently changed his clothes, washed off the blood on his arms, put the bloody clothes in a green garbage bag, and smoked a hit of cocaine. He then left the

---

[4] It is not clear from the record how the defendants first acquired the reports.

house with the garbage bag. About thirty minutes later, Noe looked out the window and saw McConnell on the sidewalk talking to Gigi Portalla. McConnell returned to the house, took some heroin, and overdosed. Noe resuscitated him and asked what had happened. McConnell responded that Noe would get killed, apparently by Portalla, if he told her. He then reportedly said, "I did something, I can't believe I did. She was your age. I'm not going into details. Remember the girl I used to take you by the house with Gigi. She worked at MVP [a sporting goods store]. We did something to her, she ratted." Docket # 2006, Ex. B at 2. He stated that Gigi Portalla and another acquaintance, Robert Nogueira, were also there, and told Noe that if the police asked her any questions, she should say that he had been home all night. Noe further reported that she later heard on the news about human remains being found in a dumpster, and that McConnell had commented, "They're going to put the puzzle together. I had to get rid of the knife in salt water." Id. Although the report does not name Silva as McConnell's victim, the details provided apparently refer to her. Finally, Noe said that McConnell had told her on another occasion that the girl (Silva) had been storing guns for Portalla.

Only the first page of the second FBI report is in the record. The page is stamped with Bates number 000436. It describes a second interview of Noe, this time on October 7, 1999, in the Massachusetts Correctional Institution - Framingham. This interview was again apparently conducted by Lt. Kee, along with FBI Special Agent Charles Gianturco and Lt. Vincent Martin. According to the second report, Noe stated that in mid-November of 1996, McConnell and Portalla tortured her. The one page of

the report presented does not explain why they tortured her, or whether this event was related to the Silva killing in any way.

Both reports bear the file number 87-BS-52344, and both are marked as part of an investigation on "11/15/96" at "East Boston, Mass." Id. at 1; Docket No. 1986, Ex. A at 1. Both reports indicate that they were dictated on April 5, 2000.

Paul A., Paul J., and John Jr. each filed § 2255 motions based on these reports, claiming that their Fifth Amendment Due Process rights under Brady v. Maryland, 373 U.S. 83 (1963), were violated because the prosecution failed to disclose the reports before their trial. Capozzi also became aware of these reports in 2011, and moved to amend his pending § 2255 motion to add a Brady claim.[5]

## II.  Defendants' § 2255 Motions Under Brady

A motion under 28 U.S.C. § 2255 must be timely filed and must not be procedurally defaulted. The government concedes that the motions here were filed within one year after the defendants, exercising due diligence, discovered the FBI reports, and they are therefore timely under 28 U.S.C. § 2255(f)(4). The defendants did not raise a Brady claim based on these reports during their appeals, which would normally constitute procedural default; but here their default is excused because even with due diligence they could not have discovered the reports until after the time for appeal had expired. See Murray v. Carrier, 477 U.S. 478, 488 (1986) (noting "cause" for default exists where the factual basis for a claim is not reasonably available).

---

[5]Capozzi's motion to amend was not barred by § 2255(h)'s "second or successive motion" rules, because I had not yet ruled on the underlying motion when the motion to amend was filed. See Ching v. United States, 298 F.3d 174, 176-79 (2d Cir. 2002) (Sotomayor, J.).

Because defendants' motions are not procedurally barred, I can consider them on the merits.

Under § 2255, a prisoner can move to vacate his sentence on the ground that the sentence was "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. Here, defendants claim that their sentences are unconstitutional because the prosecution violated their due process rights under Brady by failing to disclose exculpatory material.

To establish a Brady violation, a defendant must show (1) that the evidence at issue is favorable to him; (2) that the prosecution failed to disclose the evidence; and (3) that prejudice ensued because the evidence was material. Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Bucci v. United States, 662 F.3d 18, 38 (1st Cir. 2011). Here, the FBI reports are obviously favorable to the defendants. The government contends, however, that the prosecution team in this case never saw these FBI reports and so had no duty to disclose them. It also contends that the FBI reports were not material to each defendant's convictions.

## A. Suppression

Under Brady, prosecutors are affirmatively obligated to disclose any material exculpatory evidence they possess. That obligation also covers evidence known to police investigators working on the case, even if the prosecutor is not aware of that evidence. Kyles v. Whitley, 514 U.S. 419, 437-38 (1995). However, prosecutors are not required to actively seek out exculpatory evidence from other sources; they are only required to disclose evidence "possessed or controlled by the prosecution team or its

agents." McLaughlin v. Corsini, 577 F.3d 15, 21 (1st Cir. 2009); see also United States

v. Hall, 434 F.3d 42, 55 (1st Cir. 2006) (Brady obligation "does not extend to

information possessed by government agents not working with the prosecution");

United States v. Casas, 356 F.3d 104, 116 (1st Cir. 2004) (same).

        The government has submitted affidavits from three Assistant U.S. Attorneys, an

agent from the Bureau of Alcohol, Tobacco, Firearms & Explosives, an agent from the

Drug Enforcement Administration, and two officers of the Massachusetts State Police.

All of these officials attest that they were actively involved in investigating and

prosecuting this case. All of them further attest that they had never seen the FBI

reports at issue and were not aware of the information those reports contained until

these

§ 2255 motions. Those affidavits align with the government's consistent position

throughout this case that no FBI agent has ever been involved in this prosecution.

        Defendants, on the other hand, present no substantial evidence showing that the

prosecution team was aware of the FBI reports.[6] They also provide no evidence that

any of the officers mentioned in the reports were members of the prosecution team or

its agents. Cf. McLaughlin, 577 F.3d at 21. Instead, they rely on the fact that the reports

were created by the Massachusetts State Police and the FBI, and argue that the

prosecution should have known about any relevant reports from those agencies. They

note that they filed numerous motions before trial to compel production of any FBI files

---

[6] Capozzi has submitted a local news story which names the FBI as one of several law enforcement agencies investigating Silva's murder. I do not consider that single, off-hand comment in a local paper to be a substantial showing that FBI agents were actually part of the prosecution team, let alone that the prosecution team was aware of these specific reports.

relating to McConnell and Portalla; those motions were denied. Finally, defendants argue the prosecution was on notice of possible exculpatory information in the FBI's files because a separate FBI report containing unrelated exculpatory information had been discovered in 2004, just before trial.

But a <u>Brady</u> violation does not exist just because "the government, through a more vigorous investigation, might have been able to discover the evidence." <u>United States v. Maldonado-Rivera</u>, 489 F.3d 60, 67 (1st Cir. 2007). And that remains true even when a defendant has specifically requested that the prosecution search for particular exculpatory information. <u>See United States v. Valencia-Lucena</u>, 925 F.2d 506, 514 (1st Cir. 1991) ("<u>Brady</u> is not a rule of pretrial discovery."); <u>United States v. Chalmers</u>, 410 F. Supp. 2d 278, 287-90 (S.D.N.Y 2006) (denying motion to compel prosecution to provide discovery of evidence from other government agencies). Because defendants have not shown that the prosecution team or any of its agents knew of the exculpatory reports, they have not shown any <u>Brady</u> violation.[7]

## B. Materiality

Even if the defendants could show that the prosecution knew of the FBI reports, the reports were not material for <u>Brady</u> purposes.

To show that exculpatory evidence is material, defendants must show "a reasonable probability that, had the evidence been disclosed to the defense, the result

---

[7] Defendants apparently seek discovery to review the FBI's files in the hope of finding more exculpatory information. But even if the FBI's files contained more exculpatory information, defendants still could not establish a <u>Brady</u> violation without showing that the prosecution or its agents knew of that information. Absent specific allegations providing some reason to believe that the prosecution knew of exculpatory evidence in the FBI files, defendants have not shown good cause warranting discovery. <u>See</u> Rule 6(a), Rules Governing Section 2255 Proceedings; <u>Bracy v. Gramley</u>, 520 U.S. 899, 908-09 (1997); <u>Donald v. Spencer</u>, 656 F.3d 14, 16 (1st Cir. 2011).

of the proceeding would have been different." <u>Kyles</u>, 514 U.S. at 433 (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). A "reasonable probability" is one that "undermines confidence in the outcome of the trial." <u>Bagley</u>, 473 U.S. at 678. I must consider the favorable, undisclosed evidence along with the evidence presented at trial, and determine whether it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles</u>, 514 U.S. at 435.

Because the exculpatory evidence is relevant in different ways to each defendant, I will analyze the materiality question separately for each defendant.

### 1. Paul A.

Paul A. was convicted for his role in directing the conspiracy to kill Silva, including both the unsuccessful heroin overdose and the violent murder that followed. He argues that the FBI reports are material because they contradict the entire prosecution theory of who killed Silva: they indicate, as Paul A. had hoped to argue at trial, that Portalla owned the guns at Silva's house and Portalla's crew (including McConnell and Nogueira) killed Silva.

Paul A. is correct that the FBI reports contradict the evidence presented by the government at his trial. But given the overwhelming weight of the trial evidence, the FBI reports do not raise a reasonable probability of a different outcome. The prosecution witnesses who included participants in these events at trial presented extensive testimony that Paul A. was the leader of the DeCologero crew, that he told his crew members to kill Silva, and that his crew members did so. They explained how Silva

became involved with the DeCologero crew, how the crew acquired the guns and decided to store them at Silva's, how Paul A. decided Silva could not be trusted under interrogation, how Paul A. tried to kill Silva by heroin overdose, and how Paul A. knew after the murder what his crew members had done. The witnesses' testimony was consistent and corroborated by the physical evidence discovered by police.

The FBI reports, on the other hand, represent a hearsay account by a single witness shortly after her own arrest for bank robbery. That arrest gave Noe an obvious motive to claim she had valuable information about a then-unsolved murder case. And Noe's story is not confirmed by any evidence beyond Paul A.'s defense theory and some early news reports indicating that Portalla and his crew were suspects in the Silva murder. Nor do I credit Paul A.'s contention that he could have convincingly argued the police showed bias in focusing their investigation on him rather than Portalla.

Insofar as Paul A. argues the FBI reports would have led him to further exculpatory information, he has not shown any prejudice. Paul A. already knew before trial that Portalla, McConnell, and Nogueira were potential suspects. In other words, this is not a case in which the FBI reports could have opened a whole new field of investigation that Paul A. never considered. Whatever further evidence there might have been about Portalla, McConnell, and Nogueira, Paul A. did not need the FBI reports to find it. Cf. United States v. Coplen, 565 F.3d 1094, 1097 (8th Cir. 2009) (no Brady violation where defendant could have discovered evidence by other channels). Even as to the information in the reports themselves, Paul A. has made no showing that

Noe would have testified in accordance with these reports if she had appeared at trial.

There is a bare possibility that the FBI reports might have made a difference in Paul A.'s trial. But a possibility is not enough—Paul A's burden "is to establish a reasonable <u>probability</u> of a different result." <u>Strickler</u>, 527 U.S. at 291. Considering the FBI reports along with all of the evidence presented at trial, there is no reasonable probability of a different outcome here. Even without the undisclosed evidence, Paul A. received "a trial resulting in a verdict worthy of confidence." <u>Kyles</u>, 514 U.S. at 434.

### 2. Paul J.

Paul J. has an even weaker claim of materiality than Paul A. Paul J. was not convicted of Silva's actual killing; instead, he was convicted only for the failed attempt to kill Silva by heroin overdose. Nothing in the FBI reports contradicts the evidence showing the conspiracy to kill Silva by heroin overdose. Specifically, nothing in the reports contradicts the testimony that Paul A. told Paul J. to buy heroin in order to kill Silva; that Paul J. actually bought that heroin and made sure it would be strong enough for an overdose; and that Meuse and DiCenso subsequently gave Silva that heroin.

In any case, as described above, the evidence at trial supporting the government's theory was substantial. The FBI reports do not "put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles</u>, 514 U.S. at 435.

### 3. John Jr.

John Jr. has the weakest claim to materiality, as he was not charged with Silva's killing or any related offenses. He argues that the Silva killing "loomed over the entire trial" and was key to the credibility of the witnesses against him. Docket

# 2000, Ex. A (Shea Aff.) ¶ 5. As discussed above, the FBI reports do not raise a reasonable probability of a different outcome on the counts related to the Silva killing. A fortiori, they do not raise a reasonable probability of a different outcome on unrelated counts.

### 4. Capozzi

As discussed above, Capozzi was convicted of two counts relating to his role in Silva's killing. Those convictions were based on testimony by DiCenso describing the killing, as well as testimony by Stone that Capozzi had confessed to him on two occasions. The witnesses' testimony was corroborated by physical evidence, including the Home Depot security video showing Capozzi and Meuse purchasing four bags of lime and a shovel; the receipt for their purchase; four empty lime bags found at the Danvers dumpster; and the garbage bags and gym bags from the same dumpster with Silva's blood on them. Faced with this evidence, Capozzi did not dispute the government's charge that he had helped to dispose of Silva's body; he only argued that he did not participate in the killing, and that DiCenso (not Meuse) had actually committed the murder.

Capozzi now argues that the reports support his trial theory that although he had helped dispose of Silva's body, his indictment was flawed because someone other than Meuse actually killed Silva. Alternatively, he argues that with the reports he might have contended at trial that Portalla's crew (perhaps with DiCenso's help) killed Silva and disposed of her body without his involvement. The FBI reports do not raise a reasonable probability of a different outcome under either scenario. Under the first

15

version, Capozzi would have to argue that Portalla's crew came to DiCenso's

apartment, murdered Silva, and started to dismember her (accounting for the blood on

McConnell's clothes)—and then left halfway through, while DiCenso, Meuse, and

Capozzi finished the job (for unexplained reasons). Under the second version, Capozzi

would still face the fact that he and Meuse purchased four bags of lime and a shovel at

the Home Depot, and that four empty lime bags wound up in a dumpster in Danvers

along with Meuse's fingerprint on a box and Silva's blood on garbage bags. And under

either version, Capozzi would confront the detailed testimony of DiCenso, supported by

the physical evidence, and also the testimony of Stone as to Capozzi's two

confessions. To rebut that testimony, he would have the FBI reports: that is,

uncorroborated hearsay from a recently-arrested bank robbery suspect.[8]

Given the evidence presented at Capozzi's trial, the FBI reports do not raise a

reasonable probability that the outcome of the trial would have been different.

Therefore, they are not material for Brady purposes. Kyles, 514 U.S. at 434.[9]

## III.    Capozzi's Other Motions

---

[8] Capozzi also intimates that Stone's testimony would have been undermined if another witness, Joseph Bradshaw, had been permitted to testify at trial. He claims that Bradshaw would have testified that Stone told him he would falsely accuse Capozzi out of spite. Capozzi attempted to subpoena Bradshaw for testimony at trial; however, the subpoena was denied. I find no reason to revisit that ruling.

[9] In a later filing, Capozzi tries to establish materiality via his right to counsel. He argues that if he had known of the FBI reports, he would have proceeded through counsel rather than appearing pro se (with co-counsel) at his trial. He rests on the implicit premise that materiality can be presumed for information that might affect a decision to proceed without counsel. Of course, that argument would let any pro se defendant circumvent Brady's materiality requirement by retrospectively deciding that he would have retained counsel if only he'd known of the undisclosed material. Capozzi cites no law, and I have found none, supporting that result. It would also create tension with the general rule that a defendant may knowingly waive counsel even if he does not understand the "specific, detailed consequences" of his choice. Iowa v. Tovar, 541 U.S. 77, 92 (2004) (quoting United States v. Ruiz, 536 U.S. 622, 629 (2002). In any case, I need not address the merits of the argument here, since Capozzi's Brady claim would still fail on the suppression prong.

The analysis above resolves the § 2255 motions filed by Paul A., Paul J., and John Jr., as well as the Brady claim asserted by Capozzi in his amended § 2255 motion. Capozzi has also filed an impressive number of other motions and miscellaneous papers.

## A. Capozzi's First § 2255 Motion

Capozzi filed his first § 2255 motion on January 27, 2011. However, as he recognized in a later filing, that motion "does not contain 'claims' in it." Docket # 2070 at 2 n.1. Capozzi apparently filed this motion, which he refers to as a "ghost-pleading," to halt the one-year statute of limitations imposed by § 2255(f). Because the motion states no grounds for relief, it is obviously ineffective.[10]

## B. Capozzi's Additional § 2255 Claims

On July 29, 2011 Capozzi amended his petition to add the Brady claim discussed above. On June 11, 2012, Capozzi moved to amend his § 2255 motion again to add two further claims. However, his new claims are time-barred and meritless.

### 1. Commerce Power

First, Capozzi argues that his Hobbs Act conviction in his first trial is void because the Hobbs Act, as applied to the obstruction of illegal commerce, exceeds Congress's Commerce Power. That claim obviously lacks merit given Gonzales v. Raich, 545 U.S. 1 (2005), which established that the Commerce Power extends to regulation of illegal markets. See id. at 18-19. Furthermore, the claim is time-barred.

---

[10] The motion was also filed more than a year after Capozzi's conviction became final, meaning it would normally be time-barred under § 2255(f)(1) in any case. Capozzi argues that he is entitled to equitable tolling because he suffered serious medical problems after being stabbed through the heart in prison. Because the motion states no grounds for relief, the equitable tolling question is moot.

Capozzi's conviction became final in 2007; thus, the one-year limitations period of §

2255(f)(1) ran out long before he filed this motion on June 11, 2012. Nor can he claim

that his medical problems should have equitably tolled the deadline, since they did not

prevent him from making numerous filings in this case from at least January 27, 2011

onward.

Capozzi asserts that <u>Bond v. United States</u>, 131 S. Ct. 2355 (2011), recognized

a new right that he is relying on here. He therefore contends that the claim is timely

under § 2255(f)(3), which allows § 2255 motions within one year after a new right has

been recognized by the Supreme Court and made retroactively applicable to cases on

collateral review. But the right to challenge a statute as beyond Congress's enumerated

powers, which is the right Capozzi asserts, was recognized by the Court long before

<u>Bond</u>. <u>See, e.g.</u>, <u>Gibbons v. Ogden</u>, 22 U.S. (9 Wheat.) 1 (1824) (considering argument

that statute exceeded Commerce Power); <u>see also United States v. Lopez</u>, 514 U.S.

549 (1995) (considering argument by criminal defendant that statute exceeded

Commerce Power, and striking down statute).[11]

Capozzi also argues in a later filing that the time limit under § 2255(f) applies to

the "motion" as a whole, and so if any claim in the motion is timely, then the whole

motion is timely. Because his <u>Brady</u> claim is timely, he argues, all of his other claims

are timely as well. The Eleventh Circuit previously employed Capozzi's approach in

---

[11] Capozzi has also submitted a motion purportedly authorized by Paul A., Paul J., and John Jr. seeking to apply his Hobbs Act arguments against their Hobbs Act convictions. The motion does not satisfy the requirement that every motion must be signed by a party or his attorney, because it was apparently signed by Capozzi on behalf of each of the other defendants. <u>See</u> Fed. R. Civ. P. 11(a). In any case, the arguments are time-barred and lack merit as applied to the other defendants as well.

interpreting the habeas statute of limitations in § 2244(d)(1), but it has now discarded

that interpretation. See Zack v. Tucker, 704 F.3d 917 (11th Cir. 2013), overruling

Walker v. Crosby, 341 F.3d 1240, 1242-45 (11th Cir. 2003). The Third, Sixth, and Ninth

Circuits likewise apply a claim-by-claim approach. See Souliotes v. Evans, 622 F.3d

1173, 1179-80 (9th Cir. 2010), vacated on other grounds, 654 F.3d 902 (9th Cir. 2011);

Bachman v. Bagley, 487 F.3d 979, 983-84 (6th Cir. 2007); Fielder v. Varner, 379 F.3d

113, 116-22 (3d Cir. 2004) (Alito, J.); see also Moore's Federal Practice § 671.02. And

this approach is consistent with Supreme Court dicta regarding § 2244(d)(1). See Pace

v. DiGuglielmo, 544 U.S. 408, 416 n.6 (2005) (noting that three prongs of § 2244(d)(1)

"require claim-by-claim consideration"). Considering the text of § 2255 and its purpose,

Capozzi's interpretation must be rejected. His time-barred claims cannot be revived by

a single timely claim.

### 2. Sixth Amendment

Capozzi argues next that he was denied his Sixth Amendment right to counsel.

This claim is also time-barred and meritless.

Capozzi's Sixth Amendment claim, like the Hobbs Act claim, was filed more than

a year after his conviction became final. It does not relate back to his "ghost-pleading,"

even assuming that pleading was timely, because the "ghost-pleading" does not assert

any claims back to which it could relate. It also does not rely on any newly-discovered

evidence or newly-recognized rights.[12] And as above, the one-year deadline was not

---

[12] Capozzi later filed another motion to amend his pleading to add a claim that he was denied counsel during plea bargaining, in violation of Lafler v. Cooper, 132 S. Ct. 1376 (2012), and Missouri v. Frye, 132 S. Ct. 1399 (2012). Construing his motion liberally, he seeks to argue that Lafler and Frye established a newly-recognized right made retroactively applicable on collateral review. Even if that

equitably tolled far enough to make the claim timely, and the time-barred claim is not revived by the timely Brady claim.

Even if Capozzi's Sixth Amendment claim were timely, it still lacks merit. Capozzi moved to proceed pro se on April 8, 2002; I determined that Capozzi understood the rights and responsibilities of proceeding pro se, and granted his motion on May 7.[13] Capozzi moved two months later for attorney Bernard Grossberg to represent him, and I approved that appointment on July 15. However, Capozzi continued to take an active part in his own representation, as shown by the letters he filed on the record at the time. For instance, he specifically informed Grossberg in a letter dated February 8, 2003 that he felt Grossberg was not prepared to represent him at an upcoming hearing, and so that he planned to argue his own motions at that hearing. He subsequently filed a number of motions under his own signature, and indicated in those motions that he was acting pro se. Finally, on June 16, 2004—three months before Capozzi's first trial—I granted Capozzi's request that attorney Terrance McCarthy be appointed to succeed Grossberg as Capozzi's co-counsel, on the representation of McCarthy that he was already familiar with the case and a continuance of the trial date would not be necessary.

Capozzi now complains that he was denied his Sixth Amendment right to counsel by Grossberg's inadequate representation. Capozzi clearly was not denied all

---

argument is correct and Capozzi's Lafler/Frye claim is not time-barred, it is still meritless; as discussed below, Capozzi has not shown that he was denied counsel or that his counsel was ineffective.

[13] Capozzi argues in a later filing that his waiver of counsel was not knowing or voluntary because he did not know the FBI reports raised in his Brady claim existed. That argument plainly lacks merit. See Tovar, 541 U.S. at 87-93.

counsel; he had at least one attorney appointed to assist him at all times.[14] And though

the record reflects admitted deficiencies in Grossberg's representation, they do not

come near the level of a "complete denial of counsel" that would "entirely fail[] to

subject the prosecution's case to meaningful adversarial testing." United States v.

Cronic, 466 U.S. 648, 659 (1984). Nor has Capozzi met the test for ineffective

assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984). Under

Strickland's two-part test, Capozzi would have to (1) identify specific acts or omissions

by Grossberg that were "outside the wide range of professionally competent

assistance," id. at 690, and (2) show how those errors prejudiced his defense. He has

done neither here. All of the errors that Capozzi identifies and attributes to Grossberg,

even assuming they were outside the range of reasonable competence, could if

necessary have been rectified by McCarthy before trial. Capozzi's informed decision to

take an active role in his own defense, with the assistance first of Grossberg and then

of McCarthy, did not deny him his Sixth Amendment right to counsel.[15]

### C. Capozzi's Alternate Brady Claim

Capozzi has raised a separate Brady claim based on documents he received

from the Drug Enforcement Administration ("DEA") in response to a request under the

Freedom of Information Act (FOIA), 5. U.S.C. § 552. Capozzi requested from the DEA

any documents relating to Aislin Silva; the DEA identified over 100 pages of relevant

---

[14] Even after Capozzi moved to proceed pro se and before Grossberg was appointed, Capozzi was provided the assistance of his former attorney David Duncan as standby counsel.

[15] Because Capozzi's underlying Sixth Amendment claim fails, his derivative claim of ineffective assistance of appellate counsel for failure to raise that Sixth Amendment claim also fails.

21

documents, but withheld most of them on privacy and security grounds. Capozzi submits one document whose unredacted portion refers to "investigating groups of people involved in firearms violations, cocaine trafficking, and the murder of a 19 year old named Aislin SILVA." Docket # 2084, Ex. 3.

Capozzi has presented no evidence showing that this document, or any other documents referenced in the FOIA response, were known to the prosecution before trial. Moreover, as described above, the inculpatory evidence presented at Capozzi's second trial was overwhelming; the new evidence presented here comes nowhere near satisfying Brady's materiality standard, even taken in conjunction with the separate FBI reports about Noe. See Kyles, 514 U.S. at 433. Capozzi therefore is not entitled to relief on this claim.

### D. Capozzi's Miscellaneous Motions

Capozzi has also moved for various other forms of relief, including appointment of counsel, an evidentiary hearing, discovery, referral of his case to Attorney General Holder's committee on prosecutorial misconduct, investigation by the local U.S. attorney, and my recusal. None of those motions have merit.

## IV.   Conclusion

All pending motions in this case are hereby DENIED. Because reasonable jurists might debate whether petitioners have shown the prosecution knew of the FBI reports, and whether those reports were material, a certificate of appealability is ALLOWED as to petitioners' Brady claims based on the FBI reports. A certificate of appealability is DENIED as to all other claims.

22

__July 11, 2013__                                     __/s/Rya W. Zobel__

DATE                                             RYA W. ZOBEL
                                        UNITED STATES DISTRICT JUDGE